IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

CARLTON BRAGG,                          §
                                        §
          Plaintiff,                    §
                                        §
v.                                      §     CIVIL ACTION NO. H-11-3826
                                        §
MICHAEL ASTRUE,                         §
COMMISSIONER OF THE                     §
SOCIAL SECURITY ADMINISTRATION,         §
                                        §
          Defendant.                    §

<u>**MEMORANDUM AND RECOMMENDATION**</u>

Pending before the court[1] are Plaintiff's Motion for Summary Judgment (Doc. 10) and Defendant's Cross Motion for Summary Judgment (Doc. 9). The court has considered the motions, all relevant filings, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Plaintiff's Motion be **GRANTED** and Defendant's Motion be **DENIED.**

**I.   Case Background**

Plaintiff Carlton B. Bragg ("Plaintiff") filed this action pursuant to 42 U.S.C. § 405(g) for judicial review of an unfavorable decision by the Commissioner of the Social Security Administration ("Commissioner") regarding Plaintiff's claim for

---

[1] This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. Doc. 5.

disability benefits under Title II of the Social Security Act ("The Act"), 42 U.S.C. §§ 401-434.[2]

## A.   <u>Factual History</u>

Plaintiff was born on November 19, 1965, and was thirty-nine years old on February 25, 2005, the date of the alleged onset of disability.[3]  Plaintiff attended high school from 1973 to 1979 and earned a General Equivalency Diploma (GED) in 1984.[4] Prior to the alleged onset of disability, Plaintiff worked as a forklift operator, general laborer, and security guard.[5] Plaintiff served in the United States Navy from March 1985 to June 1995.[6]  Plaintiff claims disability based on headaches, vision problems, bronchitis, high cholesterol, deviated septum and sinus problems.[7]  Because the court must remand this action, it only recounts Plaintiff's medical history concerning his primary impairments.

### 1. Vision Problems

The record generally supports Plaintiff's claims of blurred vision, double vision, and complications from a left eye injury.

---

[2]   <u>See</u> Doc. 10, Pl.'s Mot. for Summ. J. Mot., p. 3.

[3]   <u>See</u> Tr. of the Admin. Proceedings ("Tr.") 103.

[4]   <u>See</u> Tr. 132.

[5]   <u>See</u> Tr. 127.

[6]   <u>See</u> Tr. 103, 234.

[7]   <u>See</u> Tr. 126.

The onset of vision problems dated back to a cranial injury in 1991 when Plaintiff was assaulted in Japan while on active duty for the military.[8] Plaintiff required surgery for multiple facial fractures and had extensive facial reconstruction.[9] Past ocular history indicates that the surgery required entry through both eyes to repair facial fractures, and that the left eyelid was torn and repaired.[10]

Plaintiff's more recent vision problems began in 2001 with complete loss of sight at times and double vision (diplopia) at other times.[11] In February 2005, three days before his alleged disability began, Plaintiff barely avoided an automobile collision due to double vision.[12] Plaintiff stopped driving after this incident.[13] The record shows that Plaintiff made multiple visits to the Houston Veteran Affairs Medical Center ("VAMC") with complaints related to his eyes from mid-2008 to August 2009.

On July 2, 2008, Plaintiff attended an eye consultation with complaints that his left lower eyelid caused blurred or decreased

---

[8]    See Tr. 215-17, 231.

[9]    See Tr. 66, 215-17.

[10]   See Tr. 229, 247.

[11]   See Tr. 185.

[12]   See Tr. 30.

[13]   See id.

vision.[14] The exam was unremarkable and the doctor found good lid position and motility, although a small cyst was noted on Plaintiff's left eyelid.[15]

On August 4, 2008, Plaintiff filed for an increase in his veteran disability rating based on his decreased vision and other eye problems.[16] Linda C. Epner, M.D., ("Dr. Epner") performed a disability examination of Plaintiff and found Plaintiff's best corrected visual acuity to be 20/20 in both eyes.[17] Dr. Epner noted Plaintiff's extraocular movements were intact and that double vision was not present, but noted Plaintiff's facial trauma resulted in left lower eyelid trichiasis, or inward-turning eyelashes, without entropion.[18] Plaintiff also complained that his left lower eyelid rode up and blocked his vision for two-to-three hours.[19]

On October 8, 2008, Plaintiff was examined for intermittent decrease in vision in his left eye and double vision.[20] Plaintiff

---

[14]    See Tr. 207, 249, 300-01.

[15]    See Tr. 207, 249, 300-01.

[16]    See Tr. 225.

[17]    See Tr. 211, 228-30, 246-48.

[18]    See Tr. 211, 230, 248.

[19]    See Tr. 229, 247.

[20]    See Tr. 230-34, 327-31.

stated that his left lower eyelid had occluded his view ten times in the last five years for one-to-two hours each time.[21] Plaintiff stated he stopped driving four-to-five years ago because of it.[22] Elizabeth Yeu-Lin, M.D., ("Dr. Yeu-Lin") found that Plaintiff's orbital fracture repairs caused a slight decrease in eye motility.[23] Dr. Yeu-Lin diagnosed Plaintiff with symblepharon, that is, the adhesion of the eyelid to the eyeball, and approved him for a corrective surgery.[24] Dr. Yeu-Lin also diagnosed allergic conjunctivitis and prescribed Plaintiff Patanol drops to use twice daily in his left eye.[25] Plaintiff reported that the Patanol drops caused side effects of dizziness, blurred vision, and swollen eye sensation in his pain report filled out on November 6, 2008.[26]

On February 6, 2009, Gowri Pachigolla, M.D., ("Dr. Pachigolla") examined Plaintiff in preparation for eye surgery.[27] Double vision and lower left eye pain were noted in the pre-

---

[21]     See Tr. 231, 234, 328, 330.

[22]     See Tr. 231, 328.

[23]     See Tr. 234, 329.

[24]     See Tr. 233-34, 329-30.

[25]     See Tr. 211, 232. "Allergic conjunctivitis is inflammation of the tissue lining the eyelids (conjunctiva) due to a reaction from allergy-causing substances such as pollen and dander." National Institutes of Health, http://www.nlm.nih.gov/medicineplus/ency/article/001031.htm (last visited June 27, 2012).

[26]     See Tr. 172.

[27]     See Tr. 303, 310.

operative physical report.[28] On February 17, 2009, Plaintiff called Dr. Pachigolla's office to cancel the pre-operative appointment scheduled for February 27, 2009, as well as the eye surgery scheduled for March 10, 2009.[29]

From that point, the record shows no medical treatment for six months. On August 28, 2009, Plaintiff saw Dr. Epner, who performed another disability exam.[30] In addition to Dr. Epner's initial diagnosis of trichiasis, the assessment identified lower eyelid conjunctival symblephara, intermittent exotropia causing double vision, and early posterior subcapsular cataracts.[31] The eye exam noted no double vision in Plaintiff's left far gaze.[32] Plaintiff "request[ed] follow-up motility clinic for evaluation for possible strabismus surgery to correct double vision as double vision has become more persistent and symptomatic over the past years."[33]

Plaintiff attached to his motion for summary judgment additional post-hearing medical records that were not included in the administrative record. Records dated November 2, 2009, stated

---

[28]    See Tr. 310-13.

[29]    See Tr. 319, 367.

[30]    See Tr. 363-65.

[31]    See Tr. 364.

[32]    See id.

[33]    Tr. 365.

that Plaintiff requested to reschedule his previously-canceled surgery to correct the double vision.[34] There is no indication in the record that Plaintiff obtained that surgery.

### 2. Headaches

Plaintiff complains of headaches dating back to the cranial injury in 1991.[35] While Plaintiff disclosed that he had received treatment for headaches at various Veteran Affairs ("VA") clinics from 1995 through 2009, the only records submitted were those from the Houston VAMC for the period May 3, 2007 through August 4, 2008.[36]

Plaintiff visited Mark McCauley, M.D., ("Dr. McCauley") on May 3, 2007, complaining of continued migraine headaches three times per week.[37] Dr. McCauley noted that Plaintiff had symptoms of bilateral generalized headaches, along with photophobia and visual aura, all of which symptoms are associated with migraines.[38] Plaintiff disclosed that he was not taking his prescribed migraine medication, Propranolol, because he claimed it caused

---

[34] See Doc. 10-1, Ex. 1 to Pl.'s Mot. for Summ. J., Additional Med. Records, pp. 6-7.

[35] See Tr. 45, 47, 215-17.

[36] See Tr. 206-283.

[37] See Tr. 273-76.

[38] See Tr. 274.

gastroesophageal reflux ("GERD"). [39] As a result, Dr. McCauley discontinued Propranolol and prescribed Zomig because of its prior effectiveness. [40] Dr. McCauley ordered an electromyogram ("EMG") and suggested that Plaintiff seek a neurology consult for further management of the headaches. [41]

On May 25, 2007, Plaintiff was admitted to the emergency room ("ER") complaining of chest pressure/tightness that occurred one-to-two hours after taking Zomig. [42] The ER doctor recommended that Plaintiff discontinue using Zomig and substitute caffeine/ergotamine tablets to treat the migraine headaches. [43] Plaintiff was counseled at this time to retry Propranolol due to an uncertainty whether it was the actual cause of his gastroesophageal problems; the record also noted that Propranolol would help control Plaintiff's high blood pressure. [44]

On July 17, 2007, Plaintiff had a follow-up appointment with Dr. Potu for his complaints of chronic headaches. [45] Prior to the

---

[39]    See Tr. 275.

[40]    See Tr. 274.

[41]    See Tr. 208, 275.

[42]    See Tr. 268-269.

[43]    See Tr. 268.

[44]    See id.

[45]    See Tr. 264-68.

8

appointment, Plaintiff reported that his migraine headaches were better after restarting Propranolol.[46] He was also taking caffeine tablets to supplement the headache medication.[47] Dr. Potu noted that Plaintiff had a normal physical exam.[48]

On November 27, 2007, Plaintiff returned to Dr. Potu complaining of chronic headaches.[49] Dr. Potu indicated Plaintiff's pain was within an acceptable range.[50] Plaintiff refused to see a neurologist at that time and reported doing well on Propranolol.[51]

On August 4, 2008, in connection with his request for an increase in his VA disability benefits, Plaintiff was examined by Carol W. Echols, PA-C, ("Echols").[52] Relevant to his complaints of headaches, Plaintiff reported his migraines ranged from two-to-nine in intensity on a one-to-ten scale.[53] Plaintiff alleged that his headaches would decrease in intensity, but never subsided, and that most headaches were lower intensity with more intense ones every

---

[46]     See Tr. 212, 264.

[47]     See Tr. 264, 266.

[48]     See Tr. 265.

[49]     See Tr. 212.

[50]     See Tr. 260.

[51]     See Tr. 254, 259.

[52]     See Tr. 217.

[53]     See Tr. 218-19, 235-36, 332-33.

week or two.[54] Plaintiff also reported relief from migraines by lying in cold water, retreating to a dark room, sleeping, drinking caffeine, and taking Propranolol.[55] Plaintiff reported that the headache pain was aggravated by bright light, frustration, agitation, and physical exertion (climbing stairs).[56] The neurological exam revealed that Plaintiff was alert and oriented with adequate memory and attention span and that his cranial nerves were intact.[57]

Plaintiff saw Dr. Potu on December 10, 2008, complaining of sinus congestion.[58] Chronic headaches were noted as an active problem.[59] Regarding headache complaints, Dr. Potu noted Plaintiff did not want to see neurologist.[60]

When Plaintiff was examined on February 6, 2009, in preparation for eye surgery, he reported experiencing relief from headaches by using Propranolol.[61]

---

[54]    See Tr. 218, 235, 332.

[55]    See id.

[56]    See id.

[57]    See id.

[58]    See Tr. 321-26.

[59]    See Tr. 322-25.

[60]    See Tr. 324.

[61]    See Tr. 303-10, 312.

## B.  VA Disability

On December 15, 2008, the VA granted Plaintiff benefits based on the following service-connected disabilities, retroactive to February 13, 2008:  ten percent for internal and external nasal deformities, ten percent for residual surgical scarring over eyebrows, ten percent for post operative repair of facial fractures, ten percent for inversion of the eyelid, ten percent for deviation of the nasal septum, ten percent for chronic laryngitis, thirty percent for migraine headaches and thirty percent for chronic bronchitis.[62] The overall combined rating was deemed a seventy-percent disability.[63] In his motion for summary judgment, Plaintiff states that on March 9, 2010, his disability percentage was increased to eighty percent.[64]

## C.  Procedural History

Plaintiff filed for disability benefits on October 9, 2008, alleging inability to work since February 25, 2005, as a result of head injury, pupils attached to his eyelid, headaches, sinus problems, septal deviation, bronchitis, lung operation, chronic

---

[62]    See Tr. 349-62.

[63]    See Tr. 351.

[64]    See Doc. 10-2, Ex. 2 to Pl.'s Mot. for Summ. J., Ltr. Dated Mar. 9, 2010.

11

obstructive pulmonary disease ("COPD"), and high cholesterol. [65] Plaintiff's record reflects he remained insured through September 30, 2010. [66] Thus, the relevant period for determining Plaintiff's disability status is February 25, 2005, through the end of September 2010. [67]

In connection with the application, Plaintiff completed two reports in which he described his daily activities. [68] Therein, he reported that, on some days, he had difficulty getting out of bed. [69] Plaintiff stated that on "normal" days, he had difficulty with personal care, his girlfriend helped with pet care, shopping, and transportation, and his landlord took care of yard work, while Plaintiff could perform regular housework, prepare meals, and take care of his pets. [70] Plaintiff stated that on a daily basis he watched TV, played with his dogs, played computer games and bathed his dogs every four-to-five days. [71] Plaintiff filled out a

---

[65]     See Tr. 58, 60, 103-04, 126.

[66]     See Tr. 58, 110, 122.

[67]     In order to qualify for disability insurance benefits, the claimant must prove that the onset of his disability was on or before the date on which he was last insured. Loza v. Apfel, 219 F.3d. 378, 394 (5th Cir. 2000).

[68]     See Tr. 148-57, 166-73.

[69]     See Tr. 167.

[70]     See Tr. 151-54.

[71]     See Tr. 151, 154.

disability report and stated he had difficulty with reading, breathing, coherency, and concentrating.[72] Plaintiff alleged his decreased vision caused his lack of focus.[73] Plaintiff noted, on one form, that he did not have difficulty walking whereas, on another, he stated that he could not walk or move for a long period of time due to difficulty breathing.[74] Plaintiff alleged he stopped working because he could not breathe.[75] Plaintiff noted in a subsequent disability report that he was not requesting 100 percent disability, but that his history from 2005 proved an inability to work.[76] The report also noted that Plaintiff filed for Social Security in 2005 but was denied due to lack of medical evidence.[77]

In December 2008, Dr. Rowley completed a residual functional capacity ("RFC") form.[78] Dr. Rowley noted a primary diagnosis of COPD, secondary diagnosis of post-traumatic headaches, and additional diagnoses of hyperlipidemia and septal deviation.[79] Dr.

---

[72]    See Tr. 123.

[73]    See Tr. 126.

[74]    Compare Tr. 123, with Tr. 126.

[75]    See Tr. 126.

[76]    See Tr. 185.

[77]    See id.

[78]    See Tr. 289-97.

[79]    See Tr. 289, 296.

13

Rowley found that Plaintiff's alleged limitations related to bronchitis and his eyelid were not credible.[80] Dr. Rowley did not mention GERD as an alleged limitation or as a diagnosis.[81] Plaintiff was found to have mild- to-moderate degrees of exertional limitations and no postural, manipulative, visual, communicative, or environmental limitations, according to Dr. Rowley.[82] A report by an agency doctor in March 2009 stated that Plaintiff had the following medically determinable impairments: acute bronchitis, migraines, and GERD.[83]

The Commissioner denied Plaintiff's application at the initial and reconsideration levels.[84] Plaintiff requested a hearing before an administrative law judge ("ALJ") of the Social Security Administration in May 2009.[85] Plaintiff's request was granted by the ALJ, who conducted the hearing on September 16, 2009.[86] Plaintiff waived his rights to representation at the hearing.[87] The hearing

---

[80]    See Tr. 296.

[81]    See Tr. 289-97.

[82]    See Tr. 291-93.

[83]    See Tr. 348.

[84]    See Tr. 60, 68-70.

[85]    See Tr. 71-72.

[86]    See Tr. 25-57, 73-78.

[87]    See Tr. 28, 97.

14

included testimony by Plaintiff, a medical expert, and a vocational expert.[88]

### 1. Plaintiff's Testimony

At the hearing on September 16, 2009, Plaintiff testified that his double vision and other eye problems were his primary impairments.[89] As the medical record contained a six-month gap, the ALJ gave Plaintiff time to submit those records.[90] Plaintiff responded that it would take the the VA four-to-six months to receive the medical records and then have a hearing on it.[91] The ALJ explained that she only needed photocopies of the medical records and that the VA hearing would not apply to this case:

> What the VA decided about disability is totally irrelevant. They have completely different ways that they define disability. They know nothing about the way we define disability under our laws . . . . So, what they decide and what they send to their board doesn't matter . . . . Nothing they do has any bearing on this case, okay?[92]

Plaintiff stated that he last worked in 2005.[93] According to his testimony, Plaintiff served in Vietnam for the United States

---

[88]     See Tr. 25.

[89]     See Tr. 35.

[90]     See Tr. 33-35.

[91]     See Tr. 33-34.

[92]     Tr. 34; see Tr. 33.

[93]     See Tr. 29-30.

Navy as a gunner's mate from 1985 to 1995 and as a loader/unloader at a warehouse, security guard, and clothing sorter/shipper following his military service.[94]

Plaintiff testified that he was able to lift and carry approximately ten pounds regularly and twenty pounds occasionally.[95] He stated that he had no problems with walking or sitting, except for boredom and occasionally dizziness when he first stood up.[96] He also testified that he had no physical problems that limited the use of his hands.[97]

Regarding visual limitations, Plaintiff testified he had a valid driver's license but had a restriction requiring that he wear glasses while driving.[98] Even so, Plaintiff testified that he stopped driving after he was nearly involved in a collision which he attributed to his double vision.[99]

Plaintiff testified he had no restrictions on his ability to hear.[100] Plaintiff said he could not be around extreme temperatures

---

[94]    See Tr. 31, 41.

[95]    See Tr. 36.

[96]    See Tr. 36-38.

[97]    See Tr. 39.

[98]    See id.

[99]    See Tr. 29-30, 40.

[100]    See Tr. 40.

16

because he experienced difficulty breathing in hot climates and headaches in cold climates.[101] Humidity caused Plaintiff slight problems, he said, but fumes and odors were not an issue, except for cleaning supplies.[102]

### 2. Medical Expert's Testimony

Medical Expert Philip Bentliff, M.D., ("ME Bentliff") testified that none of Plaintiff's medical conditions equaled any listing in the regulations (the "Listings").[103] Although there is no listing for headaches, ME Bentliff stated Plaintiff experienced chronic, variably severe headaches associated with nausea, vomiting, and the need to lie down in bed.[104]

ME Bentliff stated that, based on Plaintiff's testimony, absences caused by headaches severe enough to require bed rest would be frequent.[105] ME Bentliff also believed that Plaintiff would not be a good candidate for employment outdoors because extreme temperatures might exacerbate his headaches and bronchitis.[106]

---

[101]    See Tr. 40, 44, 48.

[102]    See Tr. 40-41.

[103]    See Tr. 47-48; 20 C.F.R. Pt. 404, Subpt. P, App. 1.

[104]    See Tr. 47.

[105]    See Tr. 48.

[106]    See id.

17

Regarding Plaintiff's functional capacity, ME Bentliff testified that, presumably due to his problems with blood pressure, Plaintiff could have an issue with dissonance if he stood rapidly from a sitting position.[107] ME Bentliff further testified that Plaintiff had no exertional limitations on his ability to lift, carry, stand, or walk.[108]

Because the more recent records regarding Plaintiff's eye problems were not supplied, ME Bentliff's testimony regarding Plaintiff's visual limitations was confined to Plaintiff's subjective complaints of double vision.[109] As a final note, ME Bentliff testified that Plaintiff was likely instructed by other physicians not to take aspirin-containing pain medication because of his GERD.[110]

### 3. Vocational Expert's Testimony

After the foregoing testimony, the vocational expert, Susan Rapant ("VE Rapant"), classified all of Plaintiff's prior work as semiskilled.[111] According to VE Rapant, the forklift operator position was performed at the medium exertional level and the

---

[107]   See id.

[108]   See Tr. 49.

[109]   See Tr. 49-50.

[110]   See Tr. 50.

[111]   See Tr. 52.

18

security guard position was performed at the light exertional level.[112]

The ALJ asked VE Rapant to assess the vocational ability of a hypothetical individual of the same age, education, and work experience as Plaintiff, and who had an ability to perform a broad range of light work, with limitations of no heights, hazards, dangerous machinery, ladders, scaffolds, ropes, temperature extremes, dust, chemicals, or fumes.[113] The ALJ did not include visual limitations in the RFC due to the lack of medical records.[114]

VE Rapant responded that such an individual could not perform Plaintiff's past relevant work as a forklift operator but could perform his past relevant work as a security guard, though not a full-range security guard.[115] That is, according to VE Rapant, Plaintiff could not be a commissioned security guard based on his restrictions from dangerous moving machinery and the danger associated with Plaintiff's carrying a weapon, but could perform as a non-commissioned office security guard.[116]

---

[112]   See id.

[113]   See id.

[114]   See Tr. 54.

[115]   See Tr. 52-55. The court notes that a sequential vocational guide completed by Karen Wanzer indicated that Plaintiff was able to perform all of his past relevant jobs. See Tr. 175.

[116]   See Tr. 52-53.

The ALJ then asked VE Rapant whether there were other jobs existing in significant numbers in the local or national economy that the aforementioned hypothetical individual could perform.[117] VE Rapant testified that such an individual could perform light, unskilled work, including: (1) a cashier; (2) an electronics worker; and (3) a ticket taker.[118]

The ALJ then asked the VE to assume a sedentary exertional level and asked if there were jobs existing in significant numbers in the local or national economy that the hypothetical individual could perform.[119] VE Rapant then testified that there would be sedentary, unskilled work available to such an individual, including: (1) an order clerk; (2) a charge account clerk; and (3) a sorter.[120]

The ALJ then asked VE Rapant if Plaintiff could perform any past relevant work or other work existing in significant numbers in the local or national economy if his testimony were deemed fully credible.[121] VE Rapant replied that if Plaintiff's testimony

---

[117]    See Tr. 53.

[118]    See id.

[119]    See Tr. 53-54.

[120]    See Tr. 54.

[121]    See id.

20

concerning his limitations were believed, an individual with such limitations could not maintain full-time competitive employment.[122]

The ALJ questioned whether that individual would be able to perform work existing in significant quantities in the regional or national economy if the individual had at least four absences per month due to headaches.[123] VE Rapant testified that this would not be possible because most employers would not tolerate that many absences, and, if they did, it would be considered an accommodation.[124] VE Rapant noted that the average number of unscheduled absences allowed per week by an employer was no more than one or two days on a regular basis.[125]

The hearing ended with a reminder to Plaintiff that the record would be kept open to allow him to supplement with his current medical records.[126]

The ALJ issued an unfavorable decision on April 15, 2010.[127] In June 2010, Plaintiff hired counsel and appealed the April 2010

---

[122]   See id.

[123]   See Tr. 54-55.

[124]   See Tr. 55.

[125]   See id.

[126]   See Tr. 56.

[127]   See Tr. 11-24.

decision, requesting review of the hearing decision and order.[128] On August 22, 2011, the Appeals Council denied the request for review, making the unfavorable decision of the ALJ the Commissioner's final decision.[129]

**D. Commissioner's Decision**

In her April 2010 decision, the ALJ found that Plaintiff met the insured status requirements on the alleged onset of disability and continuing through September 30, 2010.[130] The ALJ also found that Plaintiff had not engaged in substantial gainful activity during the relevant period and that he had several severe impairments ("chronic bronchitis; chronic headaches; septal deviation; injury to left eye; GERD; and hyperlipidemia"), but that these impairments did not, individually or in combination, meet any Listing.[131]

Regarding Plaintiff's RFC, the ALJ determined that Plaintiff could perform less than the full range of sedentary work and had the following limitations: (1) could not work around heights, hazards, or dangerous machinery; (2) could not climb ladders,

---

[128]    See Tr. 7-10.

[129]    See Tr. 1-4.

[130]    See Tr. 16.

[131]    See Tr. 16-17.

scaffolds, or ropes; and (3) would be precluded from working around temperature extremes, dust, chemicals, and fumes.[132]

The ALJ found that Plaintiff's alleged symptoms could reasonably have been caused by his severe impairments, but concluded that Plaintiff's statements concerning the intensity, persistence, and limiting effects of the alleged symptoms were not credible to the extent that they were inconsistent with the ALJ's RFC assessment.[133] The ALJ also found that ME Bentliff's opinion was based on Plaintiff's subjective complaints, which the ALJ found not fully credible.[134]

The ALJ concluded that Plaintiff would be unable to perform any past relevant work.[135] Based on VE Rapant's testimony, the ALJ found Plaintiff capable of performing other work existing in the regional and national economies.[136] Accordingly, the ALJ found that Plaintiff was not disabled during the relevant period.[137]

## II.   Standard of Review and Applicable Law

---

[132]     See Tr. 17.

[133]     See Tr. 19.

[134]     See id.

[135]     See Tr. 20.

[136]     See Tr. 21.

[137]     See id.

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: 1) substantial evidence in the record supports the decision; and 2) the ALJ applied proper legal standards in evaluating the evidence. Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002); Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999).

## A. Substantial Evidence

The widely accepted definition of "substantial evidence" is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion," Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000). It is "something more than a scintilla but less than a preponderance." Id. The Commissioner has the responsibility of deciding any conflict in the evidence. Id. If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm. 42 U.S.C. § 405(g); Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the

Commissioner's judgment.  Brown, 192 F.3d at 496.  In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless.  Id.

**B.  Legal Standard**

In order to obtain disability benefits, a claimant bears the ultimate burden of proving he is disabled within the meaning of the Act.  Wren v. Sullivan, 925 F.2d 123, 125 (5th Cir. 1991).  Under the applicable legal standard, a claimant is disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(a); see also Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994).  The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings.  42 U.S.C. §§ 423(d)(3), (d)(5)(A); see also Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will

25

> not be found to be disabled unless he has a "severe
> impairment;" (3) a claimant whose impairment meets or is
> equivalent to an impairment listed in [the Listings] will
> be considered disabled without the need to consider
> vocational factors; (4) a claimant who is capable of
> performing work that he has done in the past must be
> found "not disabled;" and (5) if the claimant is unable
> to perform his previous work as a result of his
> impairment, then factors such as his age, education, past
> work experience, and [RFC] must be considered to
> determine whether he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. § 404.1520. By judicial practice, the claimant bears the burden of proof on the first four of the above steps, while the Commissioner bears it on the fifth. Crowley v. Apfel, 197 F.3d 194, 198 (5th Cir. 1999); Brown, 192 F.3d at 498. If the Commissioner satisfies his step-five burden of proof, the burden shifts back to the claimant to prove he cannot perform the work suggested. Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991). The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled. Greenspan, 38 F.3d at 236.

### III. Analysis

Plaintiff requests judicial review of the Commissioner's decision to deny disability benefits. Plaintiff contends that the ALJ's decision is not supported by substantial evidence and that the ALJ did not follow proper legal procedures. Specifically, Plaintiff argues that the ALJ erred by: (1) failing to consider the VA disability rating; (2) failing to develop the record; and (3)

disregarding the non-partisan testimony of the medical expert who found Plaintiff disabled. The court finds the first argument dispositive, and, therefore, begins and ends its consideration with the first argument.

Plaintiff contends that the ALJ legally erred by failing to consider the VA disability rating. Defendant points out that, while the ALJ did not specifically reference Plaintiff's VA disability rating, the evidence used to formulate the rating was discussed. Defendant contends the evidence that the VA used to assess this rating did not establish a disability under the Social Security Act.

The VA and the Social Security Administration ("SSA") are both governmental agencies that administer disability programs to provide benefits to those deemed seriously disabled. Compare 38 C.F.R. §§ 4.1-4.31 (explaining VA disability ratings), with 20 C.F.R. §§ 404.1501-404.1599 (describing SSA procedures for determining disability). Both programs employ different criteria for determining disability. See Chambliss v. Massanari, 269 F.3d 520, 522 (5th Cir. 2001).

Although a disability determination by another governmental agency is not binding on the SSA, such a determination "is evidence that is entitled to a certain amount of weight and must be considered by the ALJ." Id.; see 20 C.F.R. § 404.1504 (discussing

disability determinations by other organizations and governmental agencies). Social Security Ruling ("SSR") 06-03p imposes a similar requirement regarding an ALJ's consideration of disability determinations by other agencies:

> [W]e are required to evaluate all the evidence in the case record that may have a bearing on our determination or decision of disability, including decisions by other governmental and nongovernmental agencies . . . Therefore, evidence of a disability decision by another governmental or nongovernmental agency cannot be ignored and must be considered.

SSR 06-03p, 2006 WL 2329939; see 20 C.F.R. § 404.1512 (b)(5).

Generally, because a VA rating specifically makes a finding on disability, it, "like a physician's finding, constitutes evidence 'entitled to great weight.'" See Latham v. Shalala, 36 F.3d 482, 483 (5th Cir. 1994) (citing Rodriguez v. Schweiker, 640 F.2d 682, 686 (5th Cir. 1981)). An ALJ may discount a VA rating only if valid reasons are cited. See Chambliss, 269 F.3d at 522 ("ALJs need not give "great weight" to a VA disability determination if they adequately explain the valid reasons for not doing so."); Welch v. Barnhart, 337 F. Supp. 2d 929, 935 (S.D. Tex. 2004).

The court finds Welch very instructive for the case at bar. In Welch, the court found that the ALJ erred by failing to consider the VA rating. 337 F. Supp. 2d at 936. The ALJ in that case stated during testimony that, according to his reading of the regulations, he did not believe that the VA rating had any effect on the case.

28

See id. at 935. Based on the ALJ's statements at the administrative hearing "regarding the VA disability determination and the ALJ's failure to discuss the same in his decision," the court found that the ALJ committed reversible error. Id. at 936. The Commissioner's decision was thus remanded to the ALJ for consideration of the VA disability rating.  Id.

   Here, the court cannot assume that the ALJ considered the VA disability determination.  As in Welch, the ALJ mentioned Plaintiff's treatment at VA facilities in her decision but did not discuss the VA disability rating, which initially established Plaintiff's disability at seventy percent before increasing it to eighty percent one month before the ALJ's decision was issued. At the hearing, the ALJ told Plaintiff that the VA rating was irrelevant and had no weight in the case, similar to comments made by the ALJ in Welch.

   In light of the ALJ's comments during the hearing, in conjunction with the ALJ's failure to discuss the VA disability rating in any manner, the court cannot assume that the ALJ considered the VA disability rating.  See id.  Thus, because the ALJ was required to consider the VA disability rating in determining whether Plaintiff was disabled, and the record indicates that she did not do so, the court finds that the ALJ

29

committed reversible legal error. See Chambliss, 269 F.3d at 522; Welch, 337 F. Supp. 2d at 936.

Accordingly, the court recommends that Plaintiff's motion for summary judgment be granted on this ground and that the case be remanded to the ALJ for consideration of the VA disability determination. Because the ALJ committed legal error requiring remand, Defendant's motion for summary judgment should be denied.

## IV. Conclusion

Based on the foregoing, the court **RECOMMENDS** that Defendant's Cross Motion for Summary Judgment be **DENIED**, that Plaintiff's Motion for Summary Judgment be **GRANTED**, and that this case be **REMANDED** to the Commissioner for further consideration in conformity with this opinion.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically. Copies of such

objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this <u>4th</u> day of September, 2012.

_____
Nancy K. Johnson
United States Magistrate Judge

31